The following constitutes
the order of the court. Signed March 30, 2015

_____
M. Elaine Hammond
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

In re

Anton Andrew Rivera and

Denise Ann Rivera,

                 Debtors.

Case No. 14-54193

Chapter 13

## MEMORANDUM DECISION RE: OBJECTION TO PROOF OF CLAIM

      Debtors Anton and Denise Rivera objected to the proof of claim filed by Deutsche Bank[1]. Deutsche Bank asserts a claim based on the Note and Deed of Trust associated with the Riveras' loan. The Riveras allege that the amount asserted in the complaint is incorrect and not supported by Deutsche Bank's records. For the reasons set forth below, the amount of the proof of claim is established as $532,272.10.

      This court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

////

////

////

---

[1] Deutsche Bank National Trust Company as Trustee for WAMU Mortgage Pass-Through Certificate Series 2005-AR6, referred to herein as "Deutsche Bank."

Background

The Riveras obtained a loan in 2004 for their home in Bethel Island, California (the "Property"). On November 16, 2004, they executed a note (the "Note") with Washington Mutual Bank, FA, which evidenced a principal indebtedness of $440,000.00. A deed of trust securing payment on the Note against the Property (the "DOT") was recorded on November 24, 2004 in the Contra Costa County Recorder's Office.

In October 2009, the Riveras entered into a Home Affordable Modification Trial Period Plan (the "TPP") with the then servicer, JPMorgan Chase Bank, NA ("JPMorgan Chase"), as successor to Washington Mutual. The TPP had an effective date of November 1, 2009. Between October 2009 and December 2009, the Riveras made three TPP payments. These payments were placed in a suspense account and applied against the contractual payments due for September and October 2009. The Riveras have made no payments on the loan since December 2009.

The Riveras filed this chapter 13 case on December 7, 2012. Deutsche Bank filed a proof of claim on January 22, 2013, evidenced by the Note, the DOT and other supporting documents (the "Claim"). Deutsche Bank asserts a secured claim in the amount of $532,272.10 against the Property, with pre-petition arrearages in the amount of $108,389.03. The Claim further provides that JPMorgan Chase services the loan. The Riveras subsequently filed their objection to Deutsche Bank's Claim (the "Objection") (Dkt. 32). Deutsche Bank opposed the Objection (Dkt. 56). This memorandum resolves the Objection as to the amount of Deutsche Bank's Claim.

In addition, the Riveras initiated an adversary proceeding against Deutsche Bank on January 9, 2013 (the "First Adversary"). The remaining claims in the First Adversary relate to fraud or breach of contract claims against Deutsche Bank based upon the TPP. In May 2013, the Riveras initiated a second adversary proceeding (the "Second Adversary"). Currently, the Second Adversary involves a challenge to Deutsche Bank's ability to enforce the Note and DOT and a Truth in Lending Act claim.

The initial hearing on the Objection was held July 18, 2013. The Riveras miscalendared the hearing and did not appear (Dkt. 67). The court announced at the hearing that the only issue to be determined with respect to the Objection was whether Deutsche Bank miscalculated the amount of the claim; the remaining issues were duplicative of the issues raised in the Second Adversary and would be resolved in that proceeding. The court set a continued hearing for October 17, 2013, and requested that Deutsche Bank file an accounting to clarify the discrepancies alleged in the Objection.

The Riveras retained counsel after the July hearing (Dkt. 81) and the parties filed a stipulation to continue the October 17 hearing to discuss a potential out-of-court resolution. The court approved the stipulation and continued the hearing to December 5, 2013. The Riveras terminated their new counsel prior to the hearing (Dkt. 89). Meanwhile, Deutsche Bank filed a declaration providing evidence to rebut the Objection (the "Mazariegos Declaration") (Dkt. 82). At the hearing, the court expressed concerns that the Mazariegos Declaration did not appear to address all of the accounting issues raised in the Objection. The court took the matter under submission and subsequently provided the Riveras the opportunity to review the declaration and provide supplemental briefing. At a continued hearing on March 20, 2014, the court set a trial date of June 25, 2014 and issued a scheduling order for further briefing. The trial was later rescheduled for July 18, 2014. Shortly after the scheduling hearing, the Riveras obtained their current counsel.

The Riveras and Deutsche Bank participated in a judicial settlement conference in early July 2014. They reached an agreement to agree, and requested that all matters be held in abeyance while they sought a consensual resolution. Ultimately, these efforts were unsuccessful.

The court then instructed the parties to file short statements regarding the issues remaining for trial. Following a November 2014 status conference, the court issued a scheduling order with a February 25, 2015 trial date.

Prior to the trial, the Riveras filed a request to enlarge the discovery deadline, which the court denied. Both parties filed motions in limine (Dkt. 146, 148, 150, 153). In response,

the court issued an order clarifying the remaining issues for trial and requiring the parties to meet-and-confer (Dkt. 152). The court denied the motions at trial but considered the legal arguments asserted therein in its analysis of the legal issues for trial.

Analysis

**I. Principal and Interest:**

1. Calculation of Principal and Interest Balance

The payment history and accounting on this loan is one of the most complicated this court has reviewed. The Riveras' loan is an adjustable rate mortgage, with monthly adjustments and negative amortization. The monthly statements provided the Riveras with four alternatives for payment:

(1) reduced interest and escrow (the "Minimum Payment"),

(2) full monthly interest and escrow,

(3) principal and full monthly interest based on the remaining scheduled loan term and escrow and

(4) principal and monthly interest based on a 15-year amortization and escrow.

If the Riveras elected the first payment option, then their principal balance increased by the difference between the reduced interest paid and the true interest accrued for that month.

Deutsche Bank's witness, Margaret Dyer, testified that the accounting system for this loan was set up to process a payment received as the Minimum Payment required on the loan. As a result, when a payment was received, it was processed as if the Riveras only paid the minimum interest required for that month, thereby increasing the principal balance. If the payment received was greater than the Minimum Payment, then any additional funds would be applied to interest (until paid in full for the month), then principal. Following is an example of applications of payments as reflected on the detailed loan history admitted as Exhibit B:

////

////

February 2005:

Minimum Payment due = $2,079.35

Paid = $2,150.11 (Minimum Payment plus late charge)

Applied:

- Late charge = $70.76
- Escrow = $664.14
- Interest = $1,599.61
- Principal paid = ($184.40) (reflected as negative amount Principal Paid)

In sum, funds are applied to the escrow and late charge, and then the remainder is applied as if the monthly interest was paid in full (i.e., more than remainder left from the payment). The principal balance is then increased by the difference between the interest payment applied and funds received, here, $184.40. This is consistent with the Home Loan Statement of February 18, 2005 received by the Riveras. (Exh. 5).

May 2005:

Minimum Payment due = $2,072.86

Option 2 (full monthly interest) amount due = $2,404.35

Paid = $2,488

Applied:

- Late charge = $70.76
- Escrow = $657.65
- Interest = $1746.70
- Principal = ($331.49) + $344.38 = $12.89 (reduction in principal)

Again, funds are applied to the late charge and escrow, then to full monthly interest. The principal balance is increased as if full interest for the month had <u>not</u> been paid. Yet the next line entry reflects a payment to principal equal to the prior principal increase, plus the excess $12.89 paid by the Riveras. This is consistent with the Home Loan Statement of May 17, 2005 received by the Riveras. (Exh. 5).

Considerable trial time was spent reviewing the 2005 payment accounting as the Riveras disputed the application of payments for this period. No other time periods were addressed by the parties during the trial. Ultimately, no discrepancies were identified, during trial or by the court, between the Riveras' records of payments made and the payments applied. Based on the testimony, the court finds that the Riveras were aware they had an interest only loan in 2005 and sought to make additional payments to reduce principal. But since the funds paid often fell between the Minimum Payment (Option 1) and full interest payment (Option 2), the result was an increase in the principal balance – albeit less than if they had only paid the Minimum Payment. In addition, late fees or pay-by-phone fees often reduced the funds available to apply towards interest or principal. As such, the court finds no error in the application of payments by Deutsche Bank.

In their challenge to the principal balance claimed, the Riveras rely on letters received by the Riveras in November 2010, 2012 and 2013 stating a declining principal balance. (Exh. 15). These annual letters provided notice of the monthly interest rate adjustments for the preceding year and of the annual principal and interest adjustment. The letters specifically referred to a "projected principal balance" and state "Assuming that all regularly scheduled payments (if any) are made between now and [next adjustment date], your balance will be [principal balance]." Clearly, the primary function of these letters was to provide the required notice of interest rate and payment changes. (Note § 4(E)). As stated, the calculation of principal is based on an assumption that all regularly scheduled payments were being made. That was not the case here.

The notice received in November 2014 was different though. (Ex. 15). It no longer provided a projected principal balance. Instead it informed borrowers of the new monthly payment amount and stated "Your new payment is based on the MONTHLY AVERAGE OF 1 YEAR US TREASURY SECURITIES index, your margin, your loan balance of $397,060.14, and your remaining loan term of 240 months." However, the court notes that when this letter was received the Riveras had been in this Chapter 13 case for a year and nine months, making payments of $1,000 per month to the Chapter 13 Trustee. The Chapter 13

Trustee has not made payments on the Claim pending resolution of the Objection. As such, the information provided in the letter does not reflect reductions in principal or remaining term as a result of any payments by the Riveras. Consistent with prior letters, it is accepted by the court as a projected balance if the payments were current.

In short, the court finds the detailed—if confusing—loan history more convincing evidence of the principal balance on the loan than references in four letters to a projected principal balance.

    2. <u>Application of Trial Plan Payments</u>[2]

The Riveras contend in their Objection, Section 2(a), that Deutsche Bank improperly applied payments made pursuant to the trial modification. Specifically, they assert that the Claim does not properly acknowledge or account for these payments on the basis that the accounting shows a default for this period, when the entire amount required by the TPP was paid.

As of July 2009, the Riveras were current on their loan payments. Ms. Rivera testified that she was informed by a bank representative that they needed to miss a payment to be considered for a loan modification. In order to seek review, the Riveras skipped their August 2009 payment. The Riveras then received a letter dated October 5, 2009, informing them that they may qualify for the TPP.[3] The TPP required trial payments of $1,736 for three months and requested additional information for review by the bank. The Riveras made the TPP payments on October 23, November 24 and December 31, 2009.

The TPP includes a four-page agreement to be signed by the borrowers.[4] Section 2.D. of that agreement provides that borrower understands and acknowledges that the lender will hold the TPP payments in suspense until enough funds accrue to pay the full payment:

---

[2] This issue was addressed at the March 20, 2014 hearing, at which time the court found that the Riveras' allegations were insufficient to require an evidentiary hearing on this issue. It is included in this memorandum in order to provide a complete record of the court's analysis on the Objection.

[3] At the March 20, 2014 hearing, the court took notice of the TPP submitted by the Riveras as Exhibit 7 to their complaint in the Second Adversary. The TPP was sent by JPMorgan Chase to the Riveras.

[4] Titled: Home Affordable Modification Trial Period Plan (Step One of Two-Step Documentation Process)

7

> The Lender will hold the payments received during the Trial Period in a non-interest bearing account until they total an amount that is enough to pay my oldest delinquent monthly payment on my loan in full. … If there is any remaining money after such payment is applied, such remaining funds will be held by the Lender and not posted to my account until they total an amount that is enough to pay the next oldest delinquent monthly payment in full.

The same disclosure is also provided in the TPP "Frequently Asked Questions":

> **Q. What do you do with my first trial period payment if I do not qualify for the program?**
> Your first trial payment will be applied to your existing loan in accordance with the terms of your loan documents. If you don't qualify for the program, we will help you evaluate other options to help you keep your home or ease your transition to a new home.
> …
> **Q. What happens to my trial period payments if I do not comply with the terms of the Trial Period Plan?**
> Your trial period payments will be applied to your existing loan according to the terms of your loan documents.

Deutsche Bank applied the TPP payments as the Riveras were informed the payments would be applied to their current loan, pending or in the absence of a HAMP loan modification. As such, the court finds that the application of the TPP payments to the Riveras loan was correct.

3. <u>Monthly Interest Rate Adjustments</u>[5]

The Riveras further claim, in their Objection, Section 2(c), that the interest rates listed in the Claim conflict with the interest rates provided to them. Attached as Exhibit D to the Objection are letters received by the Riveras notifying them of the interest rate adjustments to the loan (the "Interest Adjustment Notices") (Dkt. 32-1). Following hearings on February 6, 2014 and March 20, 2014, the court determined that the Claim and the Interest Adjustment Notices identify the same applicable interest rates for each month. The information only appears to conflict because the Claim states the applicable rate for the period stated (e.g., from 11/1/2012 to 11/30/2012) and the Interest Adjustment Notices state the applicable rate for the prior month (e.g. "Previous Interest Rate"). No adjustment to the Claim amount is required.

---

[5] This issue was addressed at the February 6 and March 20, 2014 hearings, at which time the court found that the Riveras' allegations were insufficient to require an evidentiary hearing on this issue. It is included in this memorandum in order to provide a complete record of the court's analysis on the Objection.

### 4. Payments by Master Servicer

The Note and DOT were transferred to the WaMu Mortgage Pass-Through Certificates Series 2005-AR6 Trust, a Delaware statutory trust (the "Trust").[6] The Trust was created by and operated in accordance with the Pooling and Servicing Agreement, dated April 1, 2005 (the "PSA"). It is undisputed that the Trust began reporting the Rivera loan as an asset in May 2005. Remittance reports produced by Washington Mutual Mortgage Securities Corp., the "Master Servicer" for the Trust, provide monthly reports regarding the status of the Riveras' loan.[7] Following the Riveras' default in payments, the Master Servicer began advancing funds equal to the difference between minimum monthly required funds due under the Note and the amount of funds actually received. These Master Servicer advances were required by Sec. 4.02 of the PSA: *"Advances by the Master Servicer; … the Master Servicer is obligated to advance its own funds to the Certificate Account to cover any shortfall between (i) Minimum Monthly Payments scheduled to be received in respect of Mortgage Loans and (ii) the amounts actually deposited in the Certificate Accounts on account of such payments . . . ."* As of December 12, 2012, total interest advanced on the Rivera loan was reported as $78,577.30. By June 2013, the advance had grown to $90,714.70.

The Riveras allege that since the Master Servicer made payments on the Note after their payments ceased, there is no default on the loan, and no grounds for Deutsche Bank to assert a Claim for unpaid principal and interest. They argue that the PSA inserted "additional co-obligors" or "guarantors" of the Note and that these payments satisfy the Riveras' obligations under the Note. (Dkt. 144). They rely upon the statement of obligation of person under the Note, provided in Sec. 9:

////

////

---

[6] The Riveras deny that the Trust has any interest in the Note or DOT. However, the argument advanced by the Riveras depends on the Trust owning the Note and DOT. As such, the court will assume for the purpose of this analysis that the Note and DOT are part of the Trust.

[7] The Riveras' expert, William J. Paatalo, testified that information reported by the Master Servicer may also be reviewed through the subscription service ABS Net.

> If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things.

The only signatories to the Note are Anton Rivera and Denise Rivera. No other persons were obligated on the Note at its making. The Riveras propose that the Master Servicer became a guarantor of the Note upon placement of the loan into the Trust. We look then to the PSA for a determination of whether it created a guarantor or obligor.

A "guarantor" is "one who makes a guaranty or gives security for a debt." *Black's Law Dictionary* 773 (9th Ed. 2009). Similarly, an "obligor" is "one who has undertaken an obligation; a promisor or debtor." *Id.* at 1181. The issue is whether in making the advances required by Sec. 4.02 of the PSA, the Master Servicer made a guaranty or undertook an obligation *to the Riveras or to the holder of their Note.*

The Riveras concede that they are not parties to the PSA. The PSA provides that it does not confer any benefit, legal or equitable right, remedy or claim to third-parties. (PSA § 10.09).

Further, the flow of funds provided in the PSA does not satisfy the obligation of the Riveras to the holder of their note. The PSA requires the Master Servicer to pay any difference between contractual payment and actual payment to the Certificate Account (PSA § 4.02). Funds deposited into the Certificate Account are held in trust for the Certificateholders and for the uses and purposes set forth in certain sections of the PSA (PSA § 1.01 "Certificate Account" and §3.04). Neither the Riveras, Deutsche Bank (as Trustee) nor the Trust are Certificateholders (PSA §1.01 "Certificateholder"). What is more, the additional uses of the Certificate Account do not provide a means of satisfying the obligations of any obligor on a note owned by the Trust. (PSA § 3.05).

Provisions authorizing the liquidation and foreclosure of loans not paid by the borrowers underscore this interpretation of the PSA. In fact, Sec. 3.09 authorizes foreclosure of a loan in default where satisfactory arrangements cannot be made for collection of delinquent payments. After foreclosure, the Master Servicer is authorized to reimburse itself

for prior advances that are not recoverable from the Liquidation Proceeds (PSA § 4.03 and § 101 "Liquidation Proceeds"). See also Sec. 3.05, permitting the Master Servicer to reimburse itself for late recoveries on advances or Nonrecoverable Advances.

In sum, the court finds no provisions in the PSA that establish that any party to the PSA became a guarantor or obligor of the Riveras' obligations on their Note. Other courts reviewing similar agreements have reached the same conclusion. *See Casualt v. Federal National Mortgage Association*, 915 F. Supp.2d 1113 (C.D. Cal. 2012) (finding that PSA payments were not created for the benefit of borrowers and the PSA did not constitute a forfeiture of the right to foreclose); *Pulliam v. PennyMac Mortgage Investment Trust Holding I LLC*, 2014 WL 3784238 (D. Me. July 31, 2014) (payments made by servicer based on separate contractual obligations and no evidence that payments intended to extinguish borrowers obligations); *Ouch v. Federal National Mortgage Association*, 2013 WL 139765 (D. Mass. Jan. 10, 2013) (reviewing separate contractual obligations between servicers and trusts).

### 5. Payments Applied to Escrow Before Principal and Interest

The Riveras next maintain that Deutsche Bank applied their monthly payments contrary to the terms of the DOT, and to their detriment. They assert that a portion of each payment was applied to escrow rather than principal. In support, they rely upon Sections 2 and 3 of the DOT:

> 2. **Application of Payments or Proceeds.** . . .[A]ll payments accepted and applied by Lender shall be applied in the following order of priority; (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
> …
>
> 3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum … to provide for payment of amounts due for: (a) taxes … (c) premiums for any and all insurance required by Lender … These items are called "Escrow Items." …

11

This argument fails to take into consideration that during the period the Riveras made payments, no principal was *due* on the loan. The evidence at trial established that this is a negative amortization loan. The Note and DOT do not require payments of principal until either (1) the principal balance increases to 125% of the amount borrowed ($550,000), or (2) the fifth anniversary of the due date of the first payment (December 1, 2009).[8] This is consistent with Ms. Dyer's uncontroverted testimony that the Riveras' loan is a negative amortization loan that only required minimum monthly interest payments for the first five years, unless the principal balance increased to $550,000. The loan history and Claim establish that the principal balance never reached $550,000 prior to the bankruptcy filing. Further, the Riveras only made one payment after December 1, 2009 – a TPP payment of $1,736 on December 31, 2009. This payment was held in suspense and ultimately applied with other funds to the payment due on October 1, 2009.

In contrast, escrow payments were due each month. (DOT § 3). The loan history establishes that payments were applied to interest and escrow each month. This conforms with Section 2 of the DOT: first to interest, then to escrow as no principal amount was due during this period. Accordingly, no adjustment to the Claim is required.

## II. Escrow

Calculation of escrow was identified as a disputed factual issue for trial. In support of the Claim, Deutsche Bank submitted an Escrow Account Statement dated December 18, 2012 ("Escrow Statement") (Exh. J). The Escrow Statement is kept in the regular course of business and used to determine escrow accounting for the following year. As of December 2012, it shows a negative account balance of $17,181.44. It further projects that the lowest account balance of 2013 will occur in March 2013, with a negative account balance of

---

[8] Note, Sec. 4(H) and (I); DOT – Adjustable Rate Rider, Sec. 4(H) and (I). The Note and DOT provide for annual determination of the amount sufficient to repay the projected principal balance in full on the maturity date at the applicable interest rate but payment increases are limited to 7.5% of the amount *currently being paid*. There is no limit to the adjustment at the fifth anniversary or when the principal balance equals 125% of the principal amount originally borrowed. Note, Sec. 4(E) and (F); DOT – Adjustable Rate Rider, Sec. 4(E) and (F).

$18,398.77. A minimum balance amount of $1,050.22, representing two months of estimated escrow payments, was added to the projected lowest account balance for 2013, to reach a claimed escrow amount of $19,448.99.

The Riveras did not assert any basis at trial or in their trial brief for finding that Deutsche Bank's calculation of the escrow balance is incorrect. Previously, the Riveras objected to foreclosure fees and costs of $2,908.44 on the basis that no foreclosure sale has occurred.[9] Deutsche Bank provided an invoice from California Reconveyance Company supporting the fees and costs associated with recording and notice of the notice of default and notice of trustee's sale. No further objection to this portion of the claim has been raised. As such, the court finds no adjustment to the Claim is required on the basis of the escrow calculation.[10]

### III. Execution of Proof of Claim

Finally, the Riveras object to the Claim on the basis that it is signed by an attorney representing Deutsche Bank rather than an employee. They assert that this is a violation of the Consent Judgment between JP Morgan Chase and the United States, entered on April 4, 2012 by the U.S. District Court for the District of Columbia in *United States v. Bank of America Corp.* (D.D.C. No. 12-CV-00361) (the "National Mortgage Settlement"). They cite to section (I)(D)(1)(f) of the Settlement Terms Sheet incorporated by the Consent Judgment, which requires a proof of claim to be signed by the responsible person after reasonable investigation and clearly identify the reasonable person's employer and position or title with the employer. As an initial matter, it is not clear that execution of the Claim by an attorney for the Claimant, identified as such, violates the terms of the National Mortgage Settlement.

---

[9] This issue was addressed at the March 20, 2014 hearing. Deutsche Bank's trial exhibits include the supporting evidence previously reviewed by the court.

[10] The court notes that an argument could be made that the escrow balance should be limited to the amount due of $17,181.44, as of the Petition Date. However, the loan is a continuing obligation of the Riveras. Pursuant to the Riveras on-going obligations under the loan, they are also obligated to Deutsche Bank for escrow amounts extended in 2013 – 2015 and the minimum account balance. Incorporation of the projected 2013 maximum deficiency and minimum account balance in the Claim amount allows the Riveras to cure such default through a Chapter 13 plan.

13

Even if it were found to, execution of a proof of claim by counsel for a claimant satisfies the Bankruptcy Code's requirements for assertion of a claim. Thus, there is no basis to disallow the Claim on this basis,[11] particularly where, as here, the amount claimed has been established following an evidentiary hearing.

Conclusion

As set forth herein, the court finds that Deutsche Bank established the amount of its Claim to be $532,272.10. The court shall issue an order contemporaneous with this memorandum decision.

---

[11] Courts have held that no private right of action was created by the Consent Judgment. *See Weston v. Wells Fargo Bank, N.A.,* 2014 WL 811546, at *4 (W.D.Tex. Feb. 28, 2014); *Fleshman v. Wells Fargo Bank, N.A.*, 2014 WL 2772508, at *1135-36 (D. Or. June 17, 2014); *Lawrence v. Wells Fargo Bank, N.A.*, 2014 WL 2705425, at *6 (N.D. Cal. June 13, 2014)("plaintiff has no standing to enforce the National Mortgage Settlement consent judgment"; "individual borrowers are merely incidental beneficiaries of the National Mortgage Settlement.").

**COURT SERVICE LIST**

Ronald H. Freshman, Debtors' Attorney

Stefan Perovich, Deutsche Bank's Attorney

Martha G. Bronitsky, Chapter 13 Trustee